Charles J. DuPONT, Plaintiff,

v.

Sherbern M. BECKER et al., Defendants.

Civ. A. No. 71–13–M.

United States District Court,
D. Massachusetts.

May 7, 1974.

---

John W. Connors, Connors & Doyle, Worcester, Mass., for plaintiff.

Jack A. Pirozzolo, Herrick, Smith, Donald, Farley & Ketchum, Boston, Mass., for defendants.

ALDRICH, Senior Circuit Judge.

This case was tried non-jury on a single count, for a sale of stock in alleged violation of the former Massachusetts Blue Sky Law, Mass.G.L. c. 110A, §§ 1–21.[1] Against the possibility of an appeal, I will resolve all questions of fact, whether or not necessary to my own particular view of the law.

The undisputed facts are that plaintiff DuPont is a citizen of Massachusetts, residing in Worcester. Defendants are partners, non-residents, doing a stockbrokerage business under the name and style of Fahnestock & Co. In June, 1969, defendants employed a salesman, or registered representative, named Ward, who resided in Philadelphia. On Sunday, June 8, two telephone conversations took place between plaintiff and Ward, as a result of which plaintiff bought, from, or through, defendants 5,500 shares of the stock of Spokane National Mines, Inc., ultimately paying defendants $15,480 therefor, of which $355 was represented on the confirma-

tion slip to be a commission. The stock had not been registered under the Massachusetts statute. Sometime after paying for, and before receiving the stock, plaintiff sought to rescind. Mass.G.L. c. 110A, § 18 (as amended 1965). Defendants refused and this suit was brought in the Massachusetts Superior Court and removed here. No issue arises as to tender, Mass.G.L. c. 110A, § 18, now § 410, and plaintiff has done no act from which it could be claimed he had waived his right, if he had one, to rescind.

There is a serious dispute as to who initiated the telephone conversations, each saying the other did, with considerable plausibility both ways. I find that plaintiff was at his home in Worcester; where Ward was I will discuss later. A record card kept by Ward listing sales to customers shows that he was very active in selling Spokane stock. I find, from this circumstance, from what plaintiff testified Ward told him, and from the very fact that in the first or second telephone conversation with a total stranger plaintiff agreed to invest $15,480, that Ward was an enthusiastic promoter thereof. But then, plaintiff was an enthusiastic buyer. The question comes, who sought out whom?

This matter initiates with a Mr. Ryan, who was not a witness, a resident of New York. Plaintiff and Ryan became socially acquainted in April, 1969. On June 6 or 7 Ward had a conversation with Ryan about Spokane stock, and Ryan gave Ward names, including plaintiff's, of persons he believed would be interested in buying. According to plaintiff, when Ward telephoned him he told him this as an introduction. According to Ward, it was plaintiff who made the call, he, plaintiff, bringing up the subject of Ryan. Whoever is correct, the one thing that is abundantly clear is that Ryan was right in believing that plaintiff was a good prospect.

1. This statute was replaced in its entirety in 1972 by the Uniform Securities Act, Mass.G.L., c. 110A, §§ 101–417.

With respect to who made the calls, much by-play occurred with respect to telephone bills. Obviously, it would be material to show who paid, it being unlikely that the charges would have been reversed. Ward offered what he testified was his own bill for the month, and which allegedly showed no Massachusetts charges. I excluded it because it was corroborative only if one believed the witness to begin with. If I accept Ward's testimony that plaintiff originated the calls, I do not need the bill. But unless I believe Ward, viz., that he was at home, and not in his office, and not perhaps still in New York, and that he did not charge business calls to his employers' number, the absence of a charge on his personal telephone bill would not be probative.

On the other hand, defendants sought to capitalize on the fact that plaintiff did not produce his own bill. As to this the circumstances are somewhat different; if plaintiff's bill had shown no charges to Pennsylvania, it would seem of some relevance. At the least, there would be no reason for plaintiff to charge these purely personal calls to his employer. I accordingly see a possible inference against plaintiff for not producing his bill. Plaintiff's only answer to the question whether he had checked his bill was that he had no need to do so because he knew he had not made the calls. This scarcely rebuts the inference.

This inference would be strengthened if I accepted fully Grant's testimony that prior to the institution of suit he agreed to accept the rescission if the telephone bills showed plaintiff did not make the calls. I do not exclude this offer as settlement negotiations, because it had independent relevance, Calvin Hosmer, Stolte Co. v. Paramount Cone Co., Inc., 1934, 285 Mass. 278, 281–282, 189 N.E. 192; Wagman v. Ziskind, 1920, 234 Mass. 509, 510–511, 125 N.E. 633, but I do not attach great weight to it. Grant testified that he told plaintiff that

Ward's bill showed that Ward had not made any calls. Under these circumstances I do not believe plaintiff would think that Grant would have made a turnabout upon being shown that plaintiff, too, had a negative bill.

Looking at the matter in its larger aspects, neither plaintiff nor Ward impressed me as a more inherently credible witness than the other. Consequently the question must be, is it more reasonable to suppose that Ward, learning of plaintiff's possible interest through Ryan, would call plaintiff at his home on Sunday, or that plaintiff, having learned from Ryan that Ward was the source of a valuable opportunity, called Ward at his home? In this connection I note plaintiff's testimony that he did purchase speculative stocks from time to time on tips from friends, and I also draw on common experience that a man of plaintiff's age and position might seem unlikely to purchase a substantial amount of stock over the telephone from a broker that he had never dealt with simply because the salesman identified himself as knowing a friend of his. But as against this plaintiff would be displaying truly extraordinary eagerness to call the salesman on a Sunday at his home.

In the final analysis, I resolve this question of comparative eagerness by a consideration of Ward's activities as disclosed by his record cards. Although this stock never sold for as much as $3 a share, a great many of Ward's sales were in 100 and 200 share lots. This is a demonstration of exceptional assiduousness on his part in selling this stock. That such a salesman, having learned on Friday or Saturday of a likely prospect rich enough to buy 5,000 shares (particularly a prospect whose duties called for travelling during the week) would try to make telephone contact on Sunday, would seem highly likely. On consideration of the evidence as a whole I find that this is what occurred.

I further find, if material, that defendants acted as brokers, and not as principals, in the sale of the stock, but, with the proviso that they were soliciting brokers. I do not believe that they would send a false confirmation slip.

Finally, I accept as reasonable Ward's testimony that no other Spokane sales were made by him to Massachusetts residents, and I find that none was made by any other salesman. I rest this last in part on plaintiff's testimony that Grant admitted that the stock was rubbish, and not of defendants' accustomed calibre.

The finding that Ward solicited the order might make serious difficulties for the defendants,[2] were it not for then section 3(a), excluding "[a]ny isolated sale." There is no reason not to give this language its plain meaning—I reject plaintiff's suggestion that it is to be read as applicable to a sale by an owner-vendor but not to a broker.[3] Nor do I read the proviso of section 3(a), that it does not exempt a sale "made in the course of repeated and successive transactions of a like character," as embracing sales not subject to the Massachusetts law. Kneeland v. Emerton, 1932, 280 Mass. 371, 389, 183 N.E. 155, 160. The purpose of the Massachusetts law is to exclude de minimis filings, not to cover transactions not subject to Massachusetts jurisdiction.

It follows that the complaint must be dismissed.

---

2. The definition of "sale" in the statute is broad, and it specifically includes any "solicitation, looking to a sale, or offer or attempt to sell in any form, whether spoken or written." Mass.G.L. c. 110A, § 2(d). Nor would this solicitation necessarily be removed from the statute merely because it was originated from without the state. The transaction was consummated in Massachusetts, see Restatement Second of the Conflict of Laws § 188(2) & comment e; Dickey v. Hurd, 1 Cir., 1929, 33 F.2d 415, 417–418, cert. denied 280 U.S. 601, 50 S.Ct. 82, 74 L.Ed. 646, and unlike the case when the buyer initiates the call, see, e. g., Doherty v. Bartlett, 1 Cir., 1936, 81 F.2d 920, 928, cert. denied 298 U.S. 676, 56 S.Ct. 941, 80 L.Ed. 1398, here Ward selected the instrumentality for communicating this solicitation, and obviously intended the communication to be received in Massachusetts and that plaintiff's acceptance, if any, take place in that state. Ward's solicitation could therefore be considered to have occurred in Massachusetts. Accord, Boehnen v. Walston & Co., Inc., D. S.D., 1973, 358 F.Supp. 537, 541–542; L. Loss, The Conflict of Laws and the Blue Sky Laws, 71 Harv.L.Rev. 209, 246–247 (1957).

3. The present act, section 402(b)(1), expressly excludes such a construction.